The circumstances of this case are somewhat singular, and as the questions it involves have not formed the subject of any judicial decision that is recollected in this State, it may be useful to state the principles of law as we apprehend them with some degree of minuteness. For, when the grounds of a decision are precisely ascertained, there is less danger of misapplication of its authority as a precedent, or of its extension to cases which do not, according to just analogy, range within its influence.
It is a fact stated in the record that William Howell was an idiot. As such, he was incapable of giving that free and deliberate assent which forms the essence of a contract; and the law has declared that all deeds not of record made by persons laboring under this mental infirmity, with a view to transfer their property, real or personal, are absolutely void. The exception as to deeds of record can have no operation in this State, where there is no method of levying a fine or suffering a recovery. The plaintiff's right to show the incapacity of his intestate cannot be disputed, for privies in blood, as the heir, may show the disability of the ancestor, and privies in representation, as the administrator, that of the intestate. 4 Co., 124. The law will therefore permit the plaintiff's recovery, unless he is barred by the deed with warranty, executed by his wife, when sole, to the defendant. It is, however, an additional (614) circumstance in the case that the wife of the plaintiff was under a similar disqualification with her brother to make a deed. The questions therefore to be considered are:
1st. Whether the husband may show the idiocy of his wife before coverture in order to avoid her deed.
2d. Whether the husband is barred by the warranty of the wife, under the circumstances of the case.
Previously to considering the first question, it may be premised that the terms "idiot" and "insanity" are indiscriminately applied to the wife, in the case sent up; though, if by the latter, he meant lunacy, a material legal difference exists between them. An idiot is one that has had no understanding from his infancy, and therefore is by law presumed never likely to attain any. 1 Bl., 302. A lunatic is one who has had understanding but, by disease, grief, or other accident, has lost the use of his reason. A lunatic is, indeed properly, one that has lucid intervals; sometimes enjoying his senses and sometimes not. Ibid., 304. The *Page 517 
same writer lays down the principle that consent is absolutely necessary to matrimonial contracts, and neither idiots nor lunatics are capable of consenting to anything. Ibid., 438. It is presumed, however, that the meaning of this passage is, that the former are incapable of consenting at all times, but that the latter may consent to in a lucid interval, and, consequently, can, in that state, contract matrimony; for the writer proceeds to observe, "And modern authorities have adhered to the reason of the civil law, by determining that the marriage of a lunatic not being in a lucid interval, was absolutely void. " But as the validity of Sarah Howell's marriage is not made a question upon the record, and as the equivocal use of the terms preclude any precise inference, no opinion will be given on that point. These remarks are therefore made only with the view of showing that the circumstance has not been overlooked; and to explain what might, on a slight examination of the case, be construed as giving an implied sanction to the marriage of a person legally disqualified. With respect to the question itself, the maxim relied upon is, that no man shall be suffered to stultify himself, in support of which so many cases have been cited and referred to, as strongly (615) tend to create a belief that the current of authorities sets that way. As a rule of law established by many adjudications, we do not mean to infringe it, but in our view of this case, it becomes necessary to examine the foundation on which it rests, in order to show that neither the authority of the cases not the immutable principles of justice warrant its further extension or more rigorous application. No rule is more clearly deducible from natural justice than that an obligatory contract cannot be made by a person devoid of understanding to direct his actions. Freedom and intelligence constitute a moral agent, without which facilities a person is incapable of producing by his acts any moral effect. Infants, idiots, and madmen are equally unendowed with this moral agency, and are consequently alike incapable of making a valid contract. The principle is received into the code of all civilized nations. It is even admitted, in its full force, by our law, which, however, creates an artificial distinction between the modes in which the contracts of incompetent persons are to be nullified. An infant may allege and prove his infancy; a non compos cannot do so, because, say the books, great insecurity would arise to contracts, from counterfeit madness and folly; and, supposing it to be real, a man cannot know what he did in such a situation. Influenced alone by such reasoning, the law has continued to enforce the maxim, down to a late period, from the time of Edward 3d. Before the latter period, however, the adjudications were directly opposite. this is rendered manifest by the Registrum Brevium, in which there is a writ for the alienor to recover lands conveyed to him while he was of unsound mind; by the authority of Britton, who asserts *Page 518 
that a man might allege his own insanity; and by that of Fitzherbert in his Natura Brevium, whose words are so emphatical as to leave no doubt of his real opinion of the law at the time he composed his book. "It stands with reason that a man should show how he was visited by the act of God with infirmity, by which he lost his memory and discretion for a time. As, if an infant within the age of twenty-one (616) years doth make a feoffment in fee or a lease for years, he himself shall avoid his feoffment or lease, as well within age, although he shall not have a dum fit infra aetatem within age, because the writ doth suppose him to be of full age; but an infant of the age of fourteen years hath discretion, as hath been adjudged, at such age; and if he at such an age commit felony, he shall be hanged for the same, and yet his feoffment, lease, or grant shall not bind him before the age of twenty-one years, because he hath not perfect discretion or knowledge of what he ought to do, or what is to be his profit or advantage before such an age; and therefore he shall allege that he was within age at the time of the feoffment, grant, or lease made by him; by which it appeareth that he shall allege that he had not perfect discretion at that time, for that nonage is an infirmity of nature, and cometh by the act of God, anda fortiorari, then, he who is of nonsane memory shall allege that he was not of sane memory at the time of his feoffment or grant; for the who is of unsound memory hath not any manner of discretion," etc.
The degree of credit to which these books are entitled may be best estimated by considering what is their character and pretensions, and we can thus more fairly draw a comparison between them and the others by which they are contradicted. The first book cited is supposed by some writers to be the oldest in the law, and must at least be considered as containing true precedents of such writs as were used at the time of its publication. It was printed, probably for the first time, in the year 1531, about sixty years after the art of printing was introduced into England, and may perhaps be considered as good evidence of what the law then was, as the loose dicta to be collected from the year books. Britton is a writer highly esteemed, considering the period in which he wrote, and has the reputation of conveying the doctrines of the law in a precise and satisfactory manner. It is almost superfluous to remark of Fitzherbert that he was a profound and accurate judge, whose laborious and intelligent researches, in the time of Hen. VIII, imparted methodical arrangement and luminous order to many branches of (617) the law. His work, from which the above extract is made, contains a selection of such writs from the Registrum Brevium as had not become obsolete in his time. For the particular doctrine he advances relative to this case, he is warranted by the authorities he cites; and although he has since been overruled in Stroud v. Marshall, Cro. Eliz., *Page 519 
398, yet his reasoning still retains whatever cogency it originally possessed. Having been sanctioned by some of the greatest modern lawyers, it cannot be considered altogether inconclusive. Judge Blackstone observes thus: "And from these loose authorities, which Fitzherbert does not scruple to reject as contrary to reason, the maxim that a man shall not stultify himself hath been handed down as settled law; though later opinions, feeling the inconvenience of the rule, have in many points endeavored to restrain it. " Vol. 1 Pa., 191. No direct judicial decision confirmatory of the maxim has occurred of a later date than Jac., 1, nor is it probable that it would now receive a deliberate sanction; indeed, there is a good ground to infer the contrary, from such indications as modern opinion furnish. For, in Yates v. Boen, Strange's Rep., 1104, in an action of debt upon articles, the defendant pleaded non est factum, and offered to give lunacy in evidence. The Chief Justice first thought it ought not to be admitted, upon the rule that a man shall not stultify for himself; but on the authority of Smith v. Cau, where Chief BaronPenjelly in the like case admitted it, and on considering the case ofThompson v. Leach, in 2 Ventris, 198 (reported also in 3 Mod., 301), he suffered it to be given in evidence, and the plaintiff, upon the evidence, was nonsuited. These cases completely justify the assertion ofJudge Blackstone. The same sentiment is avowed by Lord Mansfield in the House of Lords, in discussing a question brought up on a writ of error to one of the inferior courts. His language is equally forcible and apposite: "It hath been said to be a maxim that no man can plead his being a lunatic to avoid a deed executed, or excuse an act done at that time, because it is said, if he were a lunatic, he could not remember any action he did during the period of his insanity. And this (618) was doctrine formerly laid down by some Judges; but I am glad to find it hath since been exploded; for the reason for it is, in my opinion, wholly insufficient to support it; because, thought he could not remember what passed during his insanity, yet he might justly say, if he ever executed such a deed, or did such an action, it must have been during his confinement or lunacy; for he did not do it either before or since that time. As to the case in which a man's plea of insanity was actually set aside, it was nothing more than this: It was when they pleaded oretenus; the man pleaded that at the time he was out of his senses. It was replied, How do you know you were out of your senses? No man that is so knows himself to be so. And, accordingly, upon this quibble, his plea was set aside, not because it was not a valid one, if he was out of his senses, but because they concluded he was not out of his senses. If he had alleged he was at that time confined, being apprehended to be out of his senses, no advantage could have been taken to his manner of expressing himself." Appen. Bl., 150. *Page 520 
Those who vindicate the maxim on the ground of public policy seem to consider that the success of the plea depends on the testimony of the party relying upon it. But as it must be established by indifferent testimony, like any other fact, the truth is equally capable of being ascertained. And how slight is this probability, either that men should feign lunacy, when they make contracts, in order to avoid them afterwards; or if they were so disposed, that they could do it so successfully as to impose on the bystanders. Supposing it to be assumed with a degree of plausibility calculated to deceive the witnesses, and to impress them with a belief of its reality, the party contracting must then entertain the same opinion; and, believing himself to be contracting with a person of unsound mind, he must have some dishonest views, and ought not to receive the assistance of the law in enforcing such a contract. But why enforce the contract of a real lunatic, lest men should be tempted to feign lunacy, when even the former may be set aside by his committee, from (619) the time he is found to have been non compos The fact upon the inquisition is not more deliberately examined, nor likely to be more accurately determined, than where it constitutes the defense of a suit, and must be tried by the jury. To ascertain the intentions of men, their actions must be resorted to in a multitude of instances; there is no other way of exploring the operations of the heart. Whether the understanding be vitiated seems to be a question upon which a jury may receive more complete satisfaction than on many others presented to them where they have to mark the fine discrimination of intentions. Insanity, it is true, may be assumed, while infancy and duress cannot; but the bare probability that the deception should succeed, throughout all its stages, does not form a reason strong enough to sanction a principle so repugnant to natural justice.
The maxim then stands supported by various authorities, yet opposed by some that are very respectable, contained in the elementary books, as a principle of law, but the subject of reprobation with those by whom it is taught, rejected by individual judges, before whom it has occurred, and treated with entire contempt by one of great eminence, in a most important judicial investigation. It may at least be drawn from this view of the subject that the maxim ought not to be strained beyond its proper limits to govern any case not falling within the latter. The case before the Court is apprehended to be of that description; for the husband does not seek to allege the incapacity of his wife when sole, in order to annual a contract by which he is personally bound, but one set up to repel a claim made by him as the representative of a deceased person. Such an act of the wife can bear no relation to the character in which the husband now appears, nor could insanity have been feigned *Page 521 
by her with a view to enable the husband to escape from the contract now opposed to him. In this respect, therefore, the husband ought to be allowed to make any objections to the contract of the wife which he might properly allege against those of a stranger. And there seems to be as much propriety in this as in a committee showing the insanity of a lunatic in order to avoid his contracts. From these (620) reasons we are induced to think that the evidence offered by the husband ought to have been received. As to the second question, it must be repeated that the husband sues in another right, and can therefore be repelled only by transactions which have proceeded from him in that character. It is for the sake of preventing circuity of action that the law will not allow the recovery of a plaintiff against whom the defendant might afterwards effect a similar recovery. Wherever this principle operates, there will be found these two circumstances in the case, equality with regard to the amount and identity in respect to the character. As if a man covenant that he will not sue without any limitation of time. This the law construes a defeasance or absolute release, in order to avoid circuity of action. For if, in such case, the party should, contrary to his covenant, sue, the other party would recover precisely the same damages which he sustained by the others suing. 4 Bac., 266. There the two circumstances concur; the covenant was given by the plaintiff in his proper character, in which also the suit was brought; and the recovery against him would have been measured by the amount of his against the covenantee. One of the ingredients occurs in the following case, which, however, being deficient in the other, was held for that reason not to amount to a bar. In an action of waste it is no bar that the plaintiff covenanted to repair; for, in waste, the plaintiff shall recover treble damages; in covenant, only single are recovered. Moore, 23. The principle is also illustrated in the following cases: If a feme
obligee marries the obligor or one of the obligors; or if there be two feme
obligees and one of them marries the obligor; these are releases in law. But if a woman, executrix of the obligee, take the debtor to husband, this is no release in law, because she hath the debt in another right. 8 Co., 136. So, in the present case, as the husband is suing for those negroes in another right, the acts of his wife before marriage ought not to prevent his recovery. It cannot, upon any principle of justice, be considered stronger against the husband than if it were a debt (621) of the wife's contracted before marriage. Yet, suing in the character of administrator, such a debt could not be set up as a bar to the action; nor could even a debt of the husband's own contracting. 3 Atkyns, 691. And although the law has established the general liability of the husband to the debts contracted by the wife when sole, yet there *Page 522 
must be some acknowledgment on his own part to render such debt a bar, even to an action brought in his own right, as the following case evinces: "This was an action of assumpsit for money, and goods sold and delivered. Plea,non assumpsit, with notice of set-offs. The articles contained in the set-offs were three several sums of money, which were stated to have been paid by the defendant for the plaintiff, and by his direction; one of them was a sum of six guineas, stated to have been paid to a Mrs. Grandy, which the plaintiff's wife, who was a sister of the defendant, owed her for lodging before her intermarriage with the plaintiff. The counsel for the plaintiff objected to the allowance of this sum in the present action, on the ground that this was an action by the husband alone, and the debt attempted to be set off was a debt due from the wife before marriage, for which the action should be against husband and wife. It was answered that the husband, having ordered the money to be paid, had thereby made the debt his own. Eyre, C. J., said, `That for a debt of the wife dum sola, the action must be against husband and wife, and therefore could not be set off against a claim made by the husband alone, and for which the action was brought; but if it appeared that after the marriage the husband had ordered the debt to be paid, he thereby made it his own, and it could be set off. The defendant proved that the husband had done so, and was allowed the sum in his set-off.'" 2 Esp. Cas., 594. The very principle employed to contest the plaintiff's recovery is the same which produced the several statutes relative to the set-off, which, it is generally allowed, have extended the doctrine as far as the claims of justice require. Yet, whatever reasoning and analogy they furnish is totally adverse to the grounds of defense set up in the present case.
(622) The law will not, upon slight motives, suffer the course of administration to be impeded, which must happen if the personal concerns of an administrator are taken into view, where he is collecting the property of his intestate, for the use of creditors and distributees. To countenance such a doctrine by a decision of this Court would lead to consequences of the most unjust and injurious kind, and overturn the settled and well digested system, which has been handed down to use. Upon the second question, therefore, our opinion is that the husband is not barred by the warranty of his wife, under the circumstances of this case.